Filed 7/31/23  P. v. Howell CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C096275 |
| Plaintiff and Respondent, | (Super. Ct. No. 20FE020091) |
| v. | |
| CHARLES CONLEY HOWELL, | |
| Defendant and Appellant. | |

A jury found defendant Charles Conley Howell guilty of gross vehicular manslaughter and, in a bifurcated trial, found true that defendant had three prior convictions.  The jury further found true various factors in aggravation.  The trial court dismissed the three prior serious felony enhancements under Penal Code[1] section 1385 and sentenced defendant to 25 years to life.  Defendant appeals.

---

[1] Undesignated section references are to the Penal Code.

1

Defendant raises two primary contentions on appeal. First, defendant argues the trial court violated his due process rights and Evidence Code sections 350 and 352 by allowing the prosecution to use his refusal to submit to a warrantless blood draw as evidence of his guilt. Second, defendant argues the trial court violated his federal due process, Sixth Amendment, and Fourteenth Amendment rights, and Penal Code section 1111 because it failed to give an accomplice instruction for a witness. Defendant further argues the cumulative prejudicial effect of the foregoing errors deprived him of a fair trial. Finding no merit in these contentions, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Ricardo C. was in the car with Santiago D., who was driving, when defendant drove through a red light at an intersection at approximately 50 to 60 miles per hour and struck their car in cross-traffic.[2] Four witnesses testified regarding their observations of and experiences relating to the collision.

Defendant struck Santiago's car on the driver's side, broadsiding it, and pushing it up against a pole. Santiago died from his injuries. Ricardo suffered broken ribs and stayed in the hospital for four to five days under observation. Defendant was transported to the hospital but suffered minor injuries.

Prior to the collision, Rayshon P. observed defendant "[q]uickly" coming up from behind him at an intersection located before the intersection where the collision occurred. Defendant pulled up alongside Rayshon and revved his engine. Rayshon took this to mean that defendant wanted to race him. Rayshon and defendant engaged in a speed contest for approximately 10 to 20 seconds, "driving side-by-side, going over 55 miles an hour." The speed contest started approximately a quarter mile back from the intersection where the collision occurred. After defendant cut Rayshon off by moving into his lane,

---

[2] The posted speed limit was 40 or 45 miles per hour.

Rayshon "backed off." Rayshon decided he was not going to be a part of the race anymore when he saw a car at the stoplight. Defendant continued on and "was following the white line in the middle [of the road], so [his car] went between cars," and his car was half in one lane and half in another. Defendant then drove through the red light and hit Santiago's car. Rayshon and another witness could clearly see the red light and the stopped cars at the intersection, and cross-traffic moving perpendicular to them.

One of the witnesses testified that, as he was approaching the intersection where the collision occurred, he saw defendant driving up from behind him at approximately 60 miles per hour. The light at the intersection was red and the light for cross-traffic was green. Defendant did not slow down as he approached the stoplight and was driving half in one lane and half in the other lane to get around cars. Following the collision, when the witness went to render assistance, he found defendant next to his car; defendant was awake and conscious. The witness smelled "alcohol coming from around" defendant and saw "a bottle of Hennessy" on the ground approximately two or three feet from defendant.

Videos of defendant approaching the intersection and colliding with Santiago were also played for the jury. The first video showed defendant's car traveling toward the intersection where the collision occurred. That side of the intersection has a right turn lane, two traveling lanes, and a left turn lane. As defendant was driving toward the intersection in the left traveling lane at a high rate of speed, three cars were already stopped at the light—one in the right turn lane, one in the right traveling lane, and the other in the left turn lane. A fourth car, which was slowing down as it was about to reach the intersection, was in front of defendant in the left traveling lane. Defendant swerved around the car in his lane, straddling the white line between the left traveling lane and left turn lane and then swerved in front of the car in his lane, narrowly missing a collision with that car and the car in the left turn lane.

The second video showed the middle of the intersection and defendant speeding through the intersection, with no indication of him slowing down, and colliding with Santiago. The video showed defendant narrowly missing a collision with two other cars in the intersection before colliding with Santiago; the first slammed on the brakes to avoid hitting defendant and the second barely got out of defendant's way. Both videos further showed there was substantial traffic at the intersection around the time of the collision.

Sacramento Police Officer Michael Novak spoke with defendant at the hospital. Although defendant denied having had any alcohol or having taken any drugs prior to the collision, Officer Novak noticed that defendant's eyes were bloodshot and watery, and he had slowed and slurred speech. Officer Novak was unable to conduct the usual field sobriety tests and thus could not reach a conclusion as to whether defendant was under the influence because defendant was laying on a gurney with a neck brace on and his forehead was strapped to the gurney. Officer Novak was, however, able to conduct a modified version of one of the field sobriety tests—using a pen to analyze defendant's eye movements from side-to-side. Officer Novak testified that the modified test indicated that defendant was under the influence.

Officer Novak asked defendant three times during three hours whether he would submit to a blood draw; defendant refused each request. Defendant also refused to allow a doctor to take his blood for medical purposes. Defendant's blood was ultimately drawn by way of a "forced blood draw" approximately three hours after the collision. The test revealed there was no alcohol detected in defendant's blood.

An expert in "automotive inspections and mechanics" "[r]elated to collisions" testified there was no mechanical deficiency in defendant's car that could have caused or contributed to the collision.

The jury found defendant guilty of gross vehicular manslaughter. Defendant appeals.

4

DISCUSSION

I

*There Was No Prejudicial Error In Admitting*

*Defendant's Refusal To Consent To A Blood Draw*

Defendant argues the trial court erred in admitting his refusal to consent to a blood draw to show consciousness of guilt because: (1) his valid assertion of his constitutional right to refuse the request cannot be used as evidence of his guilt; (2) the implied consent law (Veh. Code, § 23612) does not provide a basis for inferring his guilt; and (3) Evidence Code sections 350 and 352 preclude admission of the irrelevant evidence. Defendant asserts the error was prejudicial under both *Chapman v. California* (1967) 386 U.S. 18, 24 and *People v. Watson* (1956) 46 Cal.2d 818, 836-837.

The People argue defendant forfeited his due process claim by failing to object on that basis in the trial court and "the trial court did not abuse its discretion in finding [the] evidence" was relevant at trial. (Boldface omitted.) Assuming we reach the merits of defendant's due process argument, the People concede "it was error for the trial court to admit evidence of [defendant's] refusal to consent to the warrantless blood draw as evidence of his consciousness of guilt," citing *People v. Wood* (2002) 103 Cal.App.4th 803, 808. The People, however, disagree that defendant was prejudiced and argue the error was harmless under both the *Chapman* and *Watson* standards.

We disagree with the People that the due process argument was forfeited. Defendant filed a motion in limine "to exclude any reference to [defendant] refusing to submit to a chemical test." (Capitalization & boldface omitted.) Defendant argued, "Any refusal to submit to a chemical test is irrelevant to the charges at hand, and should be excluded for the same reasons and legal grounds articulated above." In the two preceding motions in limine, in which defendant argued for exclusion of evidence pertaining to "the alcohol receptacles found at the scene" and that defendant "may have looked like or smelled like he had consumed alcohol" (capitalization & boldface omitted), defendant

5

argued, among other things, that admission of the evidence pertaining to alcohol would violate his due process rights under the California and federal Constitutions and deprive him of a fair trial. We thus find that defendant preserved his due process argument for appeal.

Turning to the merits, we do not address whether the trial court erred in admitting defendant's refusal to submit to a blood draw into evidence because, assuming but not deciding error occurred, the evidence against defendant was overwhelming and we agree with the People that the error was harmless under both the *Watson* and *Chapman* standards.

Gross vehicular manslaughter is defined, in relevant part, as "driving a vehicle in the commission of an unlawful act, not amounting to a felony, and with gross negligence." (§ 192, subd. (c)(1).) During closing argument, defendant conceded he was guilty of vehicular manslaughter with ordinary negligence; he argued only that he was not guilty of vehicular manslaughter with gross negligence. Defendant acknowledges the question presented is thus solely whether defendant was prejudiced as to the finding of gross negligence. (Compare *ibid.* with *id.*, subd. (c)(2) ["Driving a vehicle in the commission of an unlawful act, not amounting to a felony, but without gross negligence"].)

"Gross negligence is the exercise of so slight a degree of care as to raise a presumption of conscious indifference to the consequences. [Citation.] 'The state of mind of a person who acts with conscious indifferences to the consequences is simply, "I don't care what happens." ' [Citation.] The test is objective: whether a reasonable person in the defendant's position would have been aware of the risk involved." (*People v. Bennett* (1991) 54 Cal.3d 1032, 1036.) In the jury instruction given, which defendant does not challenge, the trial court instructed the jury consistent with CALCRIM No. 592: "Gross negligence involves more than ordinary carelessness, inattention or mistake in judgment. A person acts with gross negligence when: One, he

6

or she acts in a reckless way that creates a high risk of death or great bodily injury; and two, a reasonable person would have known that acting in that way would create such a risk. [¶] In other words, a person acts with gross negligence when the way he or she acts is so different from how an ordinarily careful person would act in the same situation, that his or her act amounts to disregard for human life or indifference to the consequences of that act."

Here, the evidence showed defendant did not care what happened and acted in a reckless way that created a high risk of death or great bodily injury. Certainly, a reasonable person would have known that acting in that way created such a risk. Even if defendant did not intend to race Rayshon, he nonetheless did so on a city street where the speed limit was either 40 or 45 miles per hour. Rayshon was able to slow down before reaching the intersection where the collision occurred. Defendant chose not to do so. Coming up on a busy intersection with a red stoplight against him and where three cars were already stopped in front of him and the car in his lane was slowing down, defendant did not slow down or apply his brakes. He instead kept driving approximately 50 to 60 miles per hour—well over the speed limit—and swerved around the car in front of him, straddled two lanes, and narrowly missed a collision with two cars before entering the intersection. Even with substantial cross-traffic moving in front of him, defendant still did not slow down or apply his brakes. He narrowly missed a collision with two more cars before plowing into Santiago. Defendant's car had no mechanical deficiency and witnesses who observed the collision from defendant's position had no problem seeing the red stoplight or the cross-traffic. There was further evidence that the smell of alcohol emanated from around defendant, an alcohol bottle was found within a couple of feet of him, and he exhibited indications of being under the influence of alcohol to a trained police officer.

Defendant's course of conduct demonstrated a complete failure to exercise any care and showed a conscious indifference to the consequences that might follow from his

7

actions.  There was thus no prejudice from any error in admitting defendant's refusal to submit to a blood draw under either *Watson* or *Chapman*.

## II

*The Trial Court Had No Duty To Sua Sponte Instruct On Accomplice Testimony*

In a single paragraph and without any analysis, defendant asserts the trial court should have instructed the jury sua sponte with either CALCRIM No. 335, pertaining to accomplice testimony when a witness was an accomplice as a matter of law, or CALCRIM No. 334, pertaining to accomplice testimony when it is a question of fact whether a witness was an accomplice, because Rayshon "engaged in the speed race which contributed to the victim's death."  We disagree.

"Section 1111 defines an accomplice as 'one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given.'  In order to be chargeable with the identical offense, the witness must be considered a principal under section 31.  That statute defines principals to include '[a]ll persons concerned in the commission of a crime . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission . . . .'  [Citations.]  A mere accessory, however, is not liable to prosecution for the identical offense, and therefore is not an accomplice."  (*People v. Horton* (1995) 11 Cal.4th 1068, 1113-1114.)

"If there is evidence from which the jury could find that a witness is an accomplice to the crime charged, the court must instruct the jury on accomplice testimony.  [Citation.]  But if the evidence is insufficient as a matter of law to support a finding that a witness is an accomplice, the trial court may make that determination and, in that situation, need not instruct the jury on accomplice testimony."  (*People v. Horton*, *supra*, 11 Cal.4th at p. 1114.)  Here, there was no evidence from which the jury could find that Rayshon was an accomplice to the crime charged.

There was no evidence Rayshon acted "with the intent to encourage or facilitate the commission of [defendant's] offense." (*People v. Carrington* (2009) 47 Cal.4th 145, 191.) Rayshon testified he participated in the speed race with defendant for 10 to 20 seconds and "backed off" after defendant cut him off by moving into his lane and Rayshon saw a car at the stoplight. There was no evidence Rayshon knew defendant would not do the same, i.e., slow down before reaching the red stoplight at the intersection, and no evidence Rayshon knew defendant would recklessly swerve around another car and run the red light at 50 to 60 miles per hour into cross-traffic. While Rayshon's participation in the speed race was reckless, it did not make him an accomplice to the gross vehicular manslaughter of Santiago. Indeed, accomplice liability is not ordinarily associated with the crime of gross vehicular manslaughter "because of the individual nature of the act and mental state involved." (*People v. Verlinde* (2002) 100 Cal.App.4th 1146, 1160, disapproved on other grounds in *People v. Cook* (2015) 60 Cal.4th 922, 939.) Neither the fact that Rayshon was given immunity for testifying against defendant nor the prosecution's statement during closing that the jury could consider the speed race in the totality of the circumstances as to defendant's conduct changes the analysis.

The trial court accordingly had no duty to sua sponte instruct the jury with CALCRIM No. 334 or CALCRIM No. 335.

### III

### *There Was No Cumulative Prejudicial Effect Requiring Reversal*

Defendant argues the cumulative prejudicial effect of the alleged errors requires reversal because it deprived him of the due process guarantee of fundamental fairness. Having rejected defendant's instructional error claim and having found no prejudice with regard to any error in admitting defendant's refusal to submit to a blood draw, we discern

9

no prejudice—singly or cumulatively—that warrants reversal.  (See *People v. Jablonski* (2006) 37 Cal.4th 774, 832.)

DISPOSITION

The judgment is affirmed.


/s/_____
ROBIE, Acting P. J.

We concur:




/s/_____
DUARTE, J.




/s/_____
MESIWALA, J.

10